***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award. The Full Commission therefore affirms the Opinion and Award of the Deputy Commissioner with modifications.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement admitted into evidence as Stipulated Exhibit #1 and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. At the time of the alleged injury sustained by plaintiff, an employer-employee relationship existed between defendant-employer and plaintiff.
3. At the time of the alleged injury sustained by plaintiff, Ace, USA was the carrier on the risk.
4. The following records have been admitted into evidence by stipulation of the parties:
a. The medical records of Southeastern Regional Medical Center dated October 9, 2002, consisting of 6 pages.
b. The medical records of Livingston Chiropractic Clinic, consisting of 30 pages.
c. The medical records of Carolina Complete Rehabilitation, consisting of 23 pages.
d. An Industrial Commission Form 22 Wage Statement, consisting of 4 pages, has been marked as Stipulated Exhibit #2 and received into evidence.
e. The records of the Employment Security Commission of North Carolina, consisting of 46 pages, have been received into evidence.
f. The deposition of H.M. Livingston, Jr., D.C., taken on behalf of plaintiff on September 9, 2003, consisting of 51 pages, with attached deposition Exhibit #1, consisting of 10 pages, has been received into evidence.
g. An independent medical evaluation report dated December 4, 2003, by Andrew Bush, M.D., has been received into evidence by stipulation of the parties.
h. A North Carolina Department of Motor Vehicle Accident Report dated October 4, 2002, consisting of 4 pages, has been marked as Defendants' Exhibit #1 and has been received into evidence without objection.
i. An APAC-Carolina Inc., Sandhills Division Corrective Action Form, consisting of 1 page, has been marked as Defendants Exhibit #2 and has been received into evidence without objection.
 *********** RULINGS ON EVIDENTIARY MATTERS
The objections contained within the deposition of H.M. Livingston, Jr., are ruled upon in accordance with the applicable provisions of the law and this Opinion and Award.
 ***********
Based upon the evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 33 years old with a GED, which he obtained in 1987 after completing the eleventh grade. Plaintiff's prior work history consists of construction, logging, asphalt paving (including work as a flagman), forklift operator, die technician, and cook.
2. In September or October of 2001, plaintiff was hired by defendant-employer as a laborer and then a flagger. Shortly thereafter, plaintiff received training and certification as a heavy equipment operator and began operating a backhoe for defendant-employer. Plaintiff continued to work as a heavy equipment operator for defendant-employer for approximately one year until the time of his injury.
3. In addition to his employment duties as heavy equipment operator, defendant-employer asked that plaintiff perform the duty of providing transportation to Mega Force temporary employees, who had been assigned to work for defendant-employer. Plaintiff's responsibilities were to ensure that the employees were transported to and from the job site locations. Plaintiff first performed this duty in his personal vehicle for approximately six months. Plaintiff received an additional one-hour compensation (half an hour for pick up and half an hour for drop off) from defendant-employer that was added to his time card for each day he transported the Mega Force employees to the job site, regardless of the time expended in pick up and drop off. On some occasions, plaintiff would pick up the employees at a central location for transportation, but more often than not plaintiff would pick up and drop off the employees at each employee's home. Typically, plaintiff did not go to defendant-employer's place of business but traveled from his home to pick up employees and then to the job site, after which he returned the employees to their homes and then proceeded to his own home.
4. In the spring of 2002, plaintiff was contacted by his supervisor and was told that he would be provided a company truck in which to transport the Mega Force employees. He was told to keep the company vehicle at his home. As part of this arrangement, defendant-employer paid for gas, oil, and maintenance of the vehicle. Plaintiff continued to receive an extra hour of compensation each day for transporting employees to and from work. Plaintiff was required to pay defendant-employer $3.00 a day for transportation to and from work, as were the employees he transported. Plaintiff was not allowed to operate the vehicle for personal business without approval from defendant-employer. Additionally, mileage and gas were checked by the foreman to assure that plaintiff was not using the vehicle for personal purposes.
5. On Friday October 4, 2002, plaintiff left home in the company truck and picked up a Mega Force Temporary employee, Dennis Locklear, in order to transport Locklear and himself to a job site located on Highway 74, southwest of Lumberton, North Carolina. The location of the job site did not necessitate plaintiff's traveling to defendant-employer's place of business. At the end of the work day, plaintiff drove Mr. Locklear to his home, turned off Highway 41/Elizabethtown Road onto Meadow Road, traveled down Meadow road approximately one quarter mile, and let Mr. Locklear off at the end of the road on which Mr. Locklear lived. Plaintiff then turned around and proceeded back to Highway 41. Plaintiff turned to the left traveling easterly on Highway 41 toward his home and was involved in a motor vehicle accident. Plaintiff claims to have been rear ended and pushed into another vehicle, which was located in front of him. However, the greater weight of the evidence, including the testimony of Trooper Rickie Smith, demonstrates that plaintiff rear ended the second vehicle in a chain of three vehicles with plaintiff's truck being the last vehicle in the accident. Trooper Smith charged plaintiff with failure to reduce speed and following too close. According to plaintiff, his body was thrown forward and then back, striking the steering wheel in the process. As a result of the motor vehicle accident, plaintiff first felt pain in his lower back and left thumb and then shortly thereafter experienced numbness radiating down his left leg.
6. Plaintiff's job transporting himself (like the others, plaintiff had to pay $3 per day for his transportation to and from the worksite) and other employees to and from the worksite began and ended at his home. That is where the company truck was housed. He was acting within the course and scope of his employment while returning the truck to its end-of-day location when the accident occurred. (Defendants argued that this part of plaintiff's job began at the location he picked up the first employee and ended at the location he dropped off the last employee. They forgot to mention that since plaintiff paid $3 per day for his own transportation from his home to the jobsite just the same as each other employee he transported paid, that the first employee he picked up was himself and the last employee he dropped off was himself at his own home.) Plaintiff's October 4, 2002, accident arose out of and in the course and scope of his employment with defendant-employer.
7. Defendants argued that plaintiff had departed from his employment and that there was no showing that he had ended his departure when the accident occurred. Some evidence of this argument was provided by the State Trooper who completed the accident report concerning the accident. However, plaintiff successfully rebutted this evidence. Part of the colloquy between defense counsel and Trooper Richie Smith follows (with emphasis added):
 Q. Now, with regard to Page 3 of the actual accident report, there's a — at the bottom, there's a box about who was at the scene and you have listed in Car Number 3, (unintelligible) Dakota Hunt?
A. Yes, sir.
 Q. Now, was Dakota Hunt, who at the time was — how old of a child — how old was he at the time?
A. Four years old at the time of the accident.
Q. Was Dakota Hunt actually there at the time?
A. I didn't see him.
Q. Did you talk with Mr. Hunt about the — the child?
A. Yes, sir.
 Q. About whether the child was there at the time of the accident?
 A. During my investigation, it's standard that we ask people that's driving the vehicle if there was anybody else with them and we have to put them on the accident report.
Q. And what did he tell you?
A. He told me, yes, that his son was with him.
 Q. Did he tell you anything about whether or not to report that to APAC as a result — and what may or may not happen with him as a result of having a child in the car?
 A. He — he stated that he didn't really want to put him on the accident report.
Q. Why was that?
A. He didn't want to get in trouble with his boss.
 Q. Did he say anything about whether he was supposed to have the child in the car at the time?
A. No, sir. No, sir.
 Q. He just said, "Please don't put it on the accident report because I don't want to get in trouble with my boss," or words to that effect?
 A. I told him, you know, I had to and he acted like he understood.
 Q. Okay. But that's — that's what he told you or he requested —
A. Yes, sir.
Q. — from you?
A. Yes, sir.
8. As plaintiff was standing at the accident site waiting for the trooper to arrive, his wife drove by on the way to take their son, Dakota Hunt, to Dakota's grandmother's house. She was taking the child to the child's grandmother's house because plaintiff was not at his house, having been delayed by the accident. Plaintiff's wife left Dakota with him, since Dakota was to spend the night with plaintiff. A little while later, a friend drove by and stopped. The friend volunteered to take Dakota home and plaintiff accepted the offer. When the trooper asked whether anyone else had been with him, plaintiff mentioned that Dakota had been with him. It might well have been that plaintiff was fearful that this information might be misinterpreted by his boss, as certainly was the case if Dakota indeed had not been in the truck that day but merely had been at the accident scene for a time. Thus, the trooper's testimony is not inconsistent with plaintiff's testimony on this point. The Full Commission finds plaintiff's testimony concerning Dakota to be credible and is unable to find any credible evidence that plaintiff had departed from the course and scope of his employment when the accident occurred.
9. Dakota's grandmother lives on 5th Street in Lumberton. Locklear lives on or near Meadow Road. Plaintiff lives at 101 Ricco Lane, near Lumberton. The Full Commission takes judicial notice of official N.C. Department of Transportation road maps for Robeson County. See State vs.Martin, 270 N.C. 286, 154 S.E.2d 96 (1967), and State vs. Saunders,245 NC 338, 95 S.E.2d 876 (1957). Such maps show that Highway 74 and the site of work that day is southwest of Lumberton. The maps further show that a direct route from the worksite to plaintiff's home, encompassing a drop-off of Locklear on Meadow Road, is from Highway 74 north on I-95 to Fifth Street. Fifth Street becomes Highway 41 as a person heads east out of Lumberton, and Highway 41 passes by Meadow Road on its way to Old Allentown Road, which is a direct and natural turnoff from Highway 41 leading to 101 Ricco Lane. The accident occurred at the intersection of Highway 41 and RPR 1954 (Moores Lane), which is between Meadow Road and Old Allentown Road. Even if plaintiff had picked up his son at the child's grandmother's house on Fifth Street, any alleged departure from the course and scope of employment ended when he departed Fifth Street headed for Meadow Road to drop off Locklear, long before the accident occurred.
10. While plaintiff was awaiting the arrival of Trooper Smith (it took the trooper more than 40 minutes to arrive at the accident scene), Bobby Smith, a foreman for defendant-employer, passed by and stopped to speak with plaintiff. According to plaintiff, he was allowed to use the foreman's cell phone to call the safety director, Steve Waters; however, Mr. Waters remembers only speaking to Mr. Smith and not to plaintiff. Mr. Smith explained some details to Mr. Waters. Plaintiff informed Mr. Waters of the accident and of his injuries. Plaintiff asked Mr. Waters for authorization to obtain medical treatment, but was told that he would need to wait until Monday due to a mandatory drug test. Prior to this accident, plaintiff had not had any problem with his back, leg, or other injured body parts. After the accident, the pain from his injuries made it impossible for him to continue doing heavy labor.
11. Over the weekend, plaintiff's pain progressively worsened and plaintiff contacted his foreman, Mr. Dove, with regard to the need to obtain medical treatment. Plaintiff was told he would need to speak to Mr. Waters. Thereafter, the Sunday evening following the accident, plaintiff was called at his home by Mr. Dove and told to report on Monday to a job site in Bladenboro, North Carolina. While at the job site in Bladenboro, plaintiff was contacted and told to report to the office in Fayetteville in order to undergo the mandatory drug test. Again, plaintiff requested authorization for medical treatment and was told he needed to wait. Plaintiff worked light duty Monday and Tuesday, flagging or directing traffic by holding a sign.
12. On October 9, 2002, the Wednesday following the motor vehicle accident, plaintiff received a call from Mr. Dove at his home and was told to leave the company truck at his home and drive to defendant-employer's office. Mr. Waters and Dan Dodd, a foreman, discussed the company's point system for driving offenses and informed plaintiff that he was terminated from defendant-employer due to his poor driving record and acquiring eight points within a 2 year period. However, evidence in the record refuted 2 of the 8 points and, thus, there is no convincing evidence that plaintiff had violated the policy.
13. Prior to October 4, 2002, defendant-employer had implemented a continuing driver qualification policy in which any employee who was charged with eight points from a violation or violations using a point schedule in any twenty-four month period would be disqualified from driving a company-owned vehicle. The policy does not indicate that termination would result after eight points. Plaintiff received three points for an accident that occurred on March 21, 2002, for which he was at fault. Plaintiff received two points for a speeding violation, with which he was charged on April 23, 2002. However, plaintiff was not convicted of this speeding violation, but defendant-employer did not remove the two points from his record. Thereafter, plaintiff received three points for the accident on October 4, 2002. Thus, plaintiff only had six points, not eight points.
14 Defendants failed to prove that a non-injured employee would have been terminated for the same conduct as plaintiff.
15. After being notified of his termination, plaintiff again requested authorization for medical treatment as his pain had become worse. Plaintiff was directed to report to human resources and speak with the human resource manager. However, the human resource manager informed plaintiff that since he had been terminated from his employment, she could no longer speak with him regarding his workers' compensation claim.
16. Plaintiff left defendant-employer's office and proceeded to Southeastern Regional Medical Center's Emergency Room, where he was seen for evaluation. Plaintiff reported being in a motor vehicle accident on Friday October 4, 2002, in which he struck the back of another vehicle. Plaintiff complained of lower back pain, which occurred gradually, and pain down his leg. Plaintiff was diagnosed with a muscle strain.
17. On November 4, 2002, plaintiff was seen by H.M. Livingston, Jr., a chiropractor located in Lumberton, North Carolina. Plaintiff complained of pain in his lower back with radiating pain and numbness into the left leg. Plaintiff reported a history on a written form of a motor vehicle accident on October 4, 2002 in which his truck rear ended the vehicle in front of him. However, Dr. Livingston recorded that plaintiff's vehicle was rear ended. Plaintiff reported feeling immediate burning back pain and subsequent leg numbness. Physical examination revealed reduced range of motion into the lumbar spine as well as tenderness in the mid lumbar region into the mid lower back. Dr. Livingston diagnosed plaintiff with a lumbosacral strain with sciatic neuralgia, which was the result of plaintiff's motor vehicle accident regardless of whether he was rear ended or he rear ended another vehicle. Dr. Livingstone found that the injuries suffered in the accident, and the pain associated with the injuries, made it impossible for plaintiff to return to heavy labor.
18. Dr. Livingston obtained x-rays, which revealed a possible avulsion fracture at L5, which was apparently ruled out at a later time. Plaintiff treated with Dr. Livingston between November 4, 2002, and January 13, 2003, receiving physical therapy in the form electrical muscle stimulation, heat, and spinal manipulation. While plaintiff received some benefit from Dr. Livingston's treatment, he continued to have many of the same complaints. Therefore, Dr. Livingston recommended that he be seen by Dr. Tallio. Plaintiff did not return to Dr. Livingston following the January 13, 2003, visit and plaintiff was not seen by Dr. Tallio.
19. When first seen on November 4, 2002, it was Dr. Livingston's opinion that plaintiff was unable to work in any type of employment. When plaintiff was last seen on January 13, 2003, Dr. Livingston felt that plaintiff had not reached maximum chiropractic or maximum medical improvement as plaintiff continued to have complaints and was in need of further evaluation and treatment by a medical doctor, probably a physiatrist.
20. On March 4, 2003, plaintiff was seen at Carolina Complete Rehabilitation Center with complaints of low back pain radiating into his left leg, which began gradually after a motor vehicle accident. Plaintiff presented with a slightly antalgic gait, a positive left straight leg raise test, and displayed negative Waddell signs. Plaintiff attended physical therapy eleven times between March 4, 2003, and April 10, 2003.
21. On May 13, 2003, plaintiff underwent a functional capacity evaluation performed by Carolina Complete Rehabilitation. Plaintiff did not exhibit inappropriate illness behavior and passed ninety percent of his validity criteria, giving him a valid validity profile, which indicates that the results of the FCE are reliable. Plaintiff's FCE results indicate that he was able to work at the light physical demand level for an eight-hour day according to the dictionary of Occupational Titles. However, plaintiff's former employment with defendant-employer is considered heavy duty and therefore not within the light physical demand level for an eight-hour day. Accordingly, the occupational therapist who completed the FCE recommended work hardening or continued therapy to increase plaintiff's abilities.
22. On December 4, 2003, over one year after the accident, plaintiff was seen for a one-time independent medical evaluation by Dr. Andrew Bush. Dr. Bush reviewed pertinent medical records and examined plaintiff. Plaintiff reported that he was rear ended instead of that he rear ended another vehicle. Plaintiff described continued low back pain since that time with an onset of left leg numbness over the weekend following the accident. Dr. Bush noted inconsistencies in the records and the physical examination. Dr. Bush was concerned with the lack of objective findings and the fact that no MRI had been performed. Dr. Bush placed emphasis on plaintiff's waiting five days for medical treatment and his delay in symptoms, which would be inconsistent with a back strain; however, the greater weight of the evidence indicates that plaintiff suffered back pain relatively soon, if not immediately, following the accident. Furthermore, plaintiff's 5-day delay in treatment is attributable to defendant-employer's insistence that he await drug testing. Furthermore, Dr. Bush noted that plaintiff's medical history was also inconsistent with a herniated disc, but plaintiff has never undergone an MRI and plaintiff may have had a pre-existing condition which was aggravated by the accident. Dr. Bush indicated that he could not form a complete opinion without an MRI and a second FCE performed by a physical therapist with whom he is familiar.
23. Considering the greater weight of the evidence of record, Dr. Livingston's opinions regarding causation and plaintiff's ability to work are afforded more weight than those of Dr. Bush who saw plaintiff on one occasion over one year following plaintiff's accident. However, Dr. Bush's opinion that plaintiff is in need of an MRI is given great weight, in particular, in light of Dr. Livingston's concerns with plaintiff's lack of improvement. Unless prohibited by the results of the MRI, plaintiff is in need of vocational rehabilitation consistent with the results of the FCE indicating that plaintiff is capable of performing light-duty employment.
24. Following plaintiff's termination from defendant-employer, plaintiff filed for and began receiving unemployment compensation benefits. As a condition of plaintiff's continued receipt of unemployment benefits, plaintiff conducted two job searches per week. Between October 14, 2002, and November 19, 2002, plaintiff contacted twelve potential employers but was not hired as a result of his job search efforts. Thereafter, plaintiff continued to seek employment but was unable to obtain any employment. Between October 15, 2002, and September 21, 2003, plaintiff received varying amounts of unemployment compensation benefits. According to Employment Security Commission records, as of September 22, 2003, plaintiff's account was active and he had received a total amount of unemployment compensation of $9,546.00 and was eligible to receive up to $10,062.00.
25. At the time of the hearing before the Deputy Commissioner, plaintiff continued to experience pain and continued to need additional medical evaluation. Plaintiff remained unemployed and under the light physical demand level restrictions imposed as a result of the functional capacity evaluation, which prevents him from returning to his previous employment. Plaintiff has not reached the point of maximum medical improvement and has, as a result of his injury by accident and accompanying pain, been unable to earn the same or greater wages in any employment since his termination by defendant-employer on October 9, 2002. His injuries and pain precluded him from continuing his heavy labor with defendant-employer, regardless of his firing.
26. All medical and vocational treatment discussed in this Opinion and Award is found to be compensable under the Workers' Compensation Act.
27. Plaintiff's average weekly wage is $446.77, yielding a weekly compensation rate of $297.86.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission reaches the following additional:
 CONCLUSIONS OF LAW
1. On October 4, 2002, plaintiff sustained a compensable injury by accident arising out of and in the scope and course of his employment with defendant-employer when he was involved in a motor vehicle accident while returning himself and his employer's truck to their usual place of abode. Although there was some evidence that plaintiff might have deviated from the course and scope of his employment and might have picked up his son from the son's grandmother's house en route, the greater weight of the evidence demonstrates that plaintiff had resumed travel upon the work-related route that he would have traveled had he not picked up his son when he was involved in the motor vehicle accident. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has proven that that his injuries precluded him from continuing to work at heavy labor and thus precluded him from earning the same or greater wages than he had been earning. Plaintiff is entitled to temporary total disability at a weekly rate of $297.86 beginning October 9, 2002, and continuing until he returns to work at the same or greater wages or until further order of the Commission, subject to defendants' credit for unemployment benefits received by plaintiff. N.C. Gen. Stat. §§ 97-29, and 97-42.1.
3. Defendants have failed to prove that plaintiff was terminated for reasons unrelated to the injury for which another uninjured worker would also have been terminated. Regardless of his termination, plaintiff has proven that he is in fact disabled based upon his pain and the greater weight of the medical evidence of record. Williams v. Pee Dee Elec.Membership Corp., 130 N.C. App. 298, 502 S.E.2d 645 (1998).
4. Plaintiff is entitled to any reasonably necessary medical and vocational treatment incurred or to be incurred, subject to statutory limitations, as a result of his injury by accident for so long as such treatment tends to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-25, and 97-25.1. Defendants are required to reimburse those who paid for such treatment in amounts consistent with the NC Workers' Compensation Fee Schedule.
5. Defendants are entitled to a credit for all unemployment benefits received by plaintiff during his period of disability. N.C. Gen. Stat. §97-42.1.
6. Defendants argue that under Harris v. Jack O. Farrell, Inc.,31 N.C. App. 204, 229 S.E.2d 45 (1976), plaintiff cannot recover because plaintiff paid for his transportation to and from the jobsite. That case is distinguishable. In Harris a foreman provided transportation to and from the jobsite in his own truck; he kept for himself the money each employee paid for transportation. Here, the employer furnished the vehicle and driver. All employees other than plaintiff might well be foreclosed had they suffered an injury while being transported to and from work. Such transportation, however, clearly was part of plaintiff's job and he was engaged in performing it when the accident occurred. Plaintiff's employment of transporting himself and other workers to and from the job site exposed him to the risk inherent in traveling upon a public highway. Hardy vs. Small, 246 N.C. 581, 99 S.E.2d 862 (1957).
7. Plaintiff's own testimony concerning his pain and his inability to continue performing heavy labor is admissible and convincing, and is buttressed by the medical evidence. He has proven his inability to earn the same wages he had been earning at the time of the injury, and has proven his inability, because of the pain, to find a job within his light-duty restrictions earning any wages. Plaintiff has met the tests ofHilliard vs. Apex Cabinet Co., 305 NC 593, 290 S.E.2d 682 (1982). He has also met the test of Russell vs. Lowe's Prods. Distribution Co.,108 NC. App. 762, 765, 425 S.E.2d 454, 457 (1993). Additionally, once disability is proven, as in this case, there is a presumption that it continues until the employee returns to work at wages equal to those he was receiving at the time the injury occurred. Radica vs. Carolina Mills,113 NC App. 440, 447, 439 S.E.2d 185, 190 (1994).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney fee herein approved and defendants' credit for unemployment benefits received by plaintiff, defendants shall pay temporary total disability compensation to plaintiff at a weekly compensation rate of $297.86 from October 9, 2002, and continuing thereafter until plaintiff returns to work at the same or greater wages or until further order of the Commission. All accrued amounts shall be paid in a lump sum. Interest at eight per cent (8%) shall be paid from July 21, 2003, through the date paid.
2. Defendant's shall pay all reasonably necessary medical and vocational expenses incurred or to be incurred by plaintiff, subject to statutory limitations, as a result of his compensable injury by accident for so long as such treatment tends to effect a cure, provide relief or lessen the period of disability. Specifically, defendants shall pay for an MRI as recommended by Dr. Bush and for vocational rehabilitation services consistent with the FCE and MRI results. Defendants shall reimburse those who paid for such treatment in amounts consistent with the NC Workers' Compensation Fee Schedule.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%)of the compensation due plaintiff under Paragraph 1 of this AWARD is hereby approved for plaintiff's counsel and shall be deducted from the sum due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth check due plaintiff under this Opinion and Award shall be forwarded by defendants directly to plaintiff's counsel.
4. Defendants shall pay the costs due the Commission.
This 8th day of December 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER